IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RICHARD DUNCAN,                          :
                                         :        Case No. 2:13-CV-01157
            Plaintiff,                   :
                                         :        JUDGE ALGENON L. MARBLEY
      v.                                 :
                                         :        Magistrate Judge Kemp
JON A. HUSTED, in his official capacity as :
SECRETARY OF STATE OF OHIO,              :
                                         :
            Defendant.                   :

<u>OPINION & ORDER</u>

This matter is before the Court on Defendant Secretary Husted's Motion for Summary

Judgment, (Doc. 64), as well as *pro se* Plaintiff Richard Duncan's Cross-Motion for Summary

Judgment, (Doc. 80); both motions are brought pursuant to Fed. R. Civ. P. 56. This case

concerns the constitutionality of S.B. 47, effective June 21, 2013, which, in pertinent part,

amended Ohio Revised Code §§ 3513.262 and .263 to impose a one-year time-limit for

independent candidates to obtain requisite nominating petition signatures in order to appear on

the ballot in Ohio, whereas, before, no time-limit existed. For the reasons stated herein,

Defendant's motion is **GRANTED**, and Plaintiff's motion is **DENIED**.

## I.      BACKGROUND
### A.  Factual Background

Plaintiff, a resident of Aurora, Ohio, desires to be an independent candidate for President

of the United States in the upcoming 2016 election, and has run in the last three presidential

elections as an independent candidate.  (*Compl.*, Doc. 2, ¶¶ 2, 10).  As part of his political

philosophy, Plaintiff funds his campaigns himself, spending less than $5,000 on each campaign,

and personally collects all of the signatures necessary for his name to appear on the ballot.  (*Id.*, ¶

1

10).  In the 2008 and 2012 election seasons, Plaintiff collected over 13,000 signatures to ensure he got the required 5,000 valid signatures. (*Id*.). In 2012, he received 12,557 votes in Ohio, Kentucky, Maryland, and Florida.  (*Id.*). In the past two elections, he spent three years gathering signatures for his nominating petition.

Plaintiff intentionally interweaves his campaign message into the signature-collection process, introducing himself to as many voters as possible. (*Plaintiff Declaration*, Doc. 81, ¶ 4). In 2008 and 2012, Plaintiff took three years to complete the signature-collection process. (*Id*. ¶ 5). A "major theme" of his campaign is his "low cost self funded endeavor." (*Id*.). Due to his limited finances, he knows he cannot compete with wealthy Presidential candidates, which he thinks is especially true after the *Citizens United* case. (*Id*.) Duncan asserts that he has a First Amendment right to spend as little on his campaign and possible, and he promoted the low-cost aspect of his campaign to voters when petitioning them for their signatures. (*Id*. at ¶ 7).

On June 6, 2013, Plaintiff began collecting signatures for the 2016 President election. (*Compl.*, Doc 2, ¶ 16).  Via a letter from Defendant dated June 21, 2013, however, Plaintiff was notified of the passage of S.B. 47, which amended Ohio Revised Code §§ 3513.262 & .263 to include a one-year limitations period on nomination-petition signatures for independent candidates.  (*Id.*, ¶ 17; *see also* Doc. 2-1). Prior to S.B. 47, Ohio law contained a deadline in which to submit the 5,000 required signatures for the nomination of independent candidates for president, but did not include a period of limitations in which an independent candidate had to collect nominating-petition signatures.

Sections 262 and 263 define the filing and processing requirements, respectively, of nominating petitions for candidates in Ohio elections. Section 262 sets forth certain procedures that the Secretary of State and the county boards of election must follow once they have received

a nominating petition. In particular, each board of election must "examine and determine the sufficiency of the signatures on the petition papers."  O.R.C. § 3513.262. Under the amended statute, a signature on a nominating petition "is not valid if it is dated more than one year before the date the nominating petition was filed."  (*Id.*).  All other matters of validity of a petition "shall be determined by the secretary of state or the board with whom such petition papers were filed."  (*Id.*).  Section 263 details the processing procedure for nominating petitions, and again requires that each board "examine and determine the sufficiency of the signatures on the petition papers transmitted to or filed with it," and that "[a] signature on a nominating petition is not valid if it is dated more than one year before the date the nominating petition was filed."  O.R.C. § 3513.263. Under Section 263, county boards of election have until the seventy-eighth day before the general election to determine the sufficiency of nominating petitions, including the validity of the signatures.

Under O.R.C. § 3513.257, persons desiring to become independent candidates for President of the United States "shall file, not later than four p.m. of the ninetieth day before the day of the general election at which the president and vice-president are to be elected, one statement of candidacy and one nominating petition" with the Secretary of State.  It also requires that the petition be signed by no fewer than 5,000 qualified electors and no more than 15,000. *Id*.

In sum, under Ohio law, any person desiring to be an independent candidate for president has 365 days to collect the necessary 5,000 signatures for a required nominating petition. While all signatures must be dated within a year of the date the candidate turns in the petition, the candidate is free to submit the petition earlier than the cut-off date. If the petition is submitted on

the deadline, the county boards of election have 12 days to certify the validity of between 5,000 and 15,000 signatures.

In response to the passage of S.B. 47, Plaintiff stopped his signature gathering campaign because he feared he would not be able to get the 5,000 signatures within a one-year period. (Doc. 81, ¶ 15). He testifies that he cannot afford to hire people to gather signatures and he questions their accuracy. He also asserts that he will be forced to spend extra money on his campaign as a result of the law, which will "dilute [his] low cost message and as a result it will lose its effectiveness in drawing supporters." He predicts he will now have to make extended multi-day trips to collect signatures, leading to increased hotel costs, where, before, he could make many single day trips over a three year period. He worries that he will be rushed when speaking with potential voters, and may appear "rude" and "drained," especially because the practical total time a candidate has to collect signatures is diminished by the 5 winter months in Ohio.

Matthew M. Damschroder, Chief Election Officer and Director of the Elections Division for Secretary Husted, attests that, based on his elections experience and training, the requirement that all signatures must be collected within a year of filing does not impose a significant obstacle to independent candidates' ballot access. He notes census data showing that approximately 12% of individuals move in a single year, and thus the one-year time limit makes it more likely that legitimate signatures may be accurately and quickly verified. He also testifies that for the 2008 presidential election, Duncan submitted 13,716 signatures and more than 6,370 were invalidated by the boards of elections; similarly, for the 2012 election Duncan submitted 12,480 signatures, of which 4,561 were invalidated.

**B. Procedural Background**

Plaintiff filed suit on November 18, 2013, alleging that §§ 262 and 263 are a "severe burden" on Plaintiff, which will force him to change his campaign, increase his spending, and "obliterate" his message. (*Id.*, ¶¶ 18-19). Plaintiff seeks relief under 42 U.S.C. § 1983, for violations of the First and Fourteenth Amendments of the United States Constitution, on the grounds that §§ 262 and 263 impermissibly burden Plaintiff's rights to free speech, free association, and right to petition the government, violate the Fourteenth Amendment's guarantee of equal protection, and place an unconstitutional burden on the voting rights of Plaintiff's supporters. (*Id.*, ¶¶ 22-24). Plaintiff seeks a declaration that §§ 262 and 263 are unconstitutional, and that Defendant be preliminarily and permanently enjoined from enforcing them. (*Id.* at 8).

On January 22, 2014, Plaintiff filed a Motion for Preliminary Injunction. (Doc. 7). On March 20, 2014, after a hearing, this Court denied Plaintiff's motion for a preliminary injunction. *Duncan v. Husted*, No. 2:2-13-cv-1157, 2014 WL 1123538 (S.D. Ohio March 20, 2014). The Court found that Duncan's constitutional challenge to §§ 262 and 263 was unlikely to succeed on the merits because the "Supreme Court has upheld election schemes setting signature and filing requirements for independent candidates, often with a much more compressed timeline than the one at issue here." *Id.* at *4 (citing *Jenness v. Fortson*, 403 U.S. 431 (1971)). The Court also found that under *Jenness*, Plaintiff's equal protection challenge could not stand, because the Supreme Court has determined that the party-primary process for major party nominees, and the signature gathering process for independent nominees, are "two alternative paths" to the ballot, "neither of which can be assumed to be inherently more burdensome than the other." *Id.* (quoting

5

*Jenness*, 403 U.S. at 440-41; citing *Am. Party of Texas v. White*, 415 U.S. 767, 786-87, n. 18 (1974) and *Storer v. Brown*, 415 U.S. 724, 740 (1974)).

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a

scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

## III.    ANALYSIS

Duncan propounds that the one-year time limit in which an independent candidate has to collect nominating petition signatures, codified at §§ 262 and 263, violates as a matter of law his and potential voters' associational rights under the Fourteenth and First Amendment, and violates as a matter of law the Equal Protection Clause. He contends that strict scrutiny applies to his challenge because the restriction severely burdens his access to the ballot and is discriminatory because it is a more severe burden to his access to the ballot than those burdens imposed on major-party candidates. He concludes that the restriction is not motivated by a compelling state interest, and, thus, is unconstitutional. The State responds that the one-year time-limit is a non-discriminatory and reasonable burden as a matter of law; therefore, it contends that rational basis applies, under which this Court should find as a matter of law that the statutes promote legitimate state interests in election regulation.

### A.  Ballot-Access Constitutional Framework

It is "beyond debate" in Supreme Court jurisprudence "that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214, 107 S. Ct. 544, 548, 93 L. Ed. 2d 514 (1986) (citations omitted). "The freedom of association protected by the First

7

and Fourteenth Amendments includes partisan political organization." *Id.* (citations omitted). For these reasons, the Supreme Court has long recognized that candidate-eligibility requirements in state election laws implicate fundamental constitutional rights. *See Anderson v. Celebrezze,* 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *see also Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (finding that associational rights and voting rights are closely connected, since "the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot"). Ballot-access restrictions, such as those at issue in this case, place burdens on two kinds of rights—the right of individuals to associate for the advancement of political beliefs and the right of qualified voters of all political persuasions to cast their votes effectively. *Rhodes*, 393 U.S. 23, 30-31, 89 S.Ct. 5.

The Supreme Court has repeatedly recognized, however, that the right to vote in any manner and the right to associate for political purposes through the ballot not are absolute. *Burdick v. Takushi*, 504 U.S. 428, 432-34, 112 S. Ct. 2059, 2062-64, 119 L. Ed. 2d 245 (1992) (citing *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986)). Instead, the Constitution permits States to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, which the Supreme Court has interpreted to mean that States retain the power to regulate their own elections so that they can be maintained in a "fair and honest" manner, absent of chaos. *Id.* at 433; *see also Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."). Thus, not all restrictions imposed by the States on candidates' ballot access impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564.

To balance the competing constitutional interests of political parties and voters against the state's interest in operating elections equitably and efficiently, the Supreme Court has developed a three-part test to evaluate election statutes challenged under the First and Fourteenth Amendments, normally referred to as the *Andersen-Burdick* test. *The Green Party of Tennessee v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (citing *Burdick,* 504 U.S. 428, 434, 441, 112 S.Ct. 2059; *Anderson,* 460 U.S. 780, 788–89, 103 S.Ct. 1564).  In this Circuit, the *Andersen-Burdick* test serves as "a single standard for evaluating challenges to voting restrictions," *Obama for Am. v. Husted,* 697 F.3d 423, 430 (6th Cir.2012), which includes First Amendment, Due Process Clause of the Fourteenth Amendment, and Equal Protection Clause of the Fourteenth Amendment claims, as all such claims challenge constraints on the equal opportunity to exercise the right to associational and political expression. *The Green Party of Tennessee (V) v. Hargett*, 767 F.3d 533, 545-48 (6th Cir. 2014).

Most recently in *The Green Party v. Hargett*, the Sixth Circuit distilled the Supreme Court's test for assessing the constitutionality of a ballot-access law:

> Under the *Anderson–Burdick* test, the court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. Second, it must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* Finally, it must "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

> When the burden on the right to vote is "severe," the statute will be subject to strict scrutiny and must be narrowly tailored and advance a compelling state interest. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. If the burden is "reasonable" and "nondiscriminatory," the statute will be subject to rational basis and survive if the state can identify "important regulatory interests" to justify it. *See id.* If the burden lies somewhere in between, courts will "weigh[ ] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Green Party V,* 767 F.3d at 546.

791 F.3d at 693.

## B.  Facial v. As-Applied Challenge

As a threshold issue, it is necessary to determine whether Plaintiff makes a facial constitutional challenge, an as-applied constitutional challenge, or both, to the one-year limitations period for collecting the 5,000 nominating petition signatures. Recently in *Green Party of Tennessee v. Hargett*, the Sixth Circuit explained the difference between both types of challenges to the constitutionality of a statute:

> A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." *Speet v. Schuette,* 726 F.3d 867, 871 (6th Cir.2013) (internal quotation marks omitted). The plaintiff must establish " 'that no set of circumstances exist under which [the statute] would be valid.' "*Id.* at 872 (quoting *United States v. Stevens,* 559 U.S. 460, 472, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010)). In contrast, an as-applied challenge "argues that a law is unconstitutional as enforced against the plaintiffs before the court." *Speet,* 726 F.3d at 872. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). In fact, a claim can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications. *John Doe No. 1 v. Reed,* 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010). In constitutional challenges reaching beyond the plaintiff's circumstances, the plaintiff must satisfy the "standards for a facial challenge to the extent of that reach." *Id.*

791 F.3d at 691-92.

While neither party addresses clearly whether Plaintiff makes a facial or as-applied challenge to the one-year time limit in which an independent candidate has to collect nominating petition signatures, codified at §§ 262 and 263, this Court determines that Plaintiff makes both types of challenges. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972) (finding that *pro se* pleadings are held to a less stringent standard than formal pleadings drafted by lawyers). In his complaint, Duncan states that he seeks a declaration of the invalidity

of S.B. 47, which he contends unconstitutionally restricts freedom of expression of the citizens of Ohio. This charge constitutes a facial challenge. In addition, however, Duncan makes an as-applied challenge to the one-year limitations period, asserting that it is a severe burden on him, personally, because it "obliterates Duncan's beliefs or ideas or message of operating a low cost campaign, as he now must hire signature gatherers." Further, in his reply brief he argues that even assuming he can find volunteers who will work for free to help him gather signatures, such an action would "alter or destroy Duncan's 'walking tour' and thus constitute a severe burden." This Court will consider Duncan's facial and as-applied challenges, in turn.

### C.  Facial Challenge

To determine whether the requirement that an independent candidate must collect 5,000 signatures in one year is facially constitutional, the Court first must determine whether the burden on a candidate's access to the ballot is minimal or severe. To determine the severity of the burden, the Court must consider both whether it is reasonable, and also whether it is nondiscriminatory. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. Then, depending on the severity of the burden, this Court must apply the correlated level of scrutiny to evaluate the legitimacy of the State's justifications for the rule. *Id*.

### 1.  Severity of the Burden

### a.  Whether the One-Year Requirement is Reasonable or Unduly Burdensome

In general, the Supreme Court has held as a matter of law that states may impose reasonable restrictions on ballot access, including the requirement that independent candidates obtain a certain number of nominating petition signatures within a certain amount of time. *Jenness*, 403 U.S. at 442, 91 S.Ct. 1970. Such a requirement serves the legitimate purposes of ensuring that independent political candidates can show a "significant modicum of support" from

11

the public, and avoiding "confusion, deception, and even frustration of the democratic process at the general election." *Id*. The narrow question, then, in nominating petition challenges like this one is whether the number of signatures that must be obtained within a confined period of time is so unreasonably burdensome that it practically prevents the candidate from obtaining ballot access, in violation of the First and Fourteenth Amendments.

On its face, the requirement that an independent candidate must collect 5,000 signatures in one year is not unduly burdensome on an independent's candidates' associational rights. As explained in this Court's Opinion and Order denying Plaintiff's motion for a preliminary injunction, the Supreme Court has upheld much more burdensome nominating petition schemes than the one at issue here. In *Jenness v. Fortson*, the Court upheld Georgia's ballot-access regime, under which independent candidates could "confine themselves to an appeal for write-in votes," or could "seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question." 403 U.S. at 438. While the Court noted that the 5% figure was somewhat higher than that required in many states as a condition for a ballot position, it reasoned that such a figure was "balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes. Georgia in this case has insulated not a single potential voter from the appeal of new political voices within its borders." *Id*. at 442. Thus, the Court concluded that Georgia's system "in no way [froze] the status quo, but implicitly recognize[d] the potential fluidity of American political life." *Id.* at 439.

Similarly, in *American Party of Texas v. White*, the Supreme Court upheld a nominating petition scheme in which independent presidential candidates had a 55-day time period in which to gather 22,000 signatures, finding that such a scheme was neither "unreasonable" nor "unduly

burdensome." 415 U.S. at 787, n. 18. In addition to collecting the requisite signatures in the

prescribed time period, candidates were prohibited from obtaining signatures from a voter who

had participated in another party's primary election or nominating process, and also were

required to notarize the signatory's sworn statement that the signatory had not participated in any

of the party's nominating or qualifying proceedings. *Id*. at 788. The Court determined that the

55-day time span was not unduly burdensome, positing that if 100 volunteer canvassers were put

to work, each would only have to collect four signatures per day for 55 days to achieve the

22,000 signatures. *Id*. at 786. The Court rejected the plaintiffs' protestations that the

requirements were too onerous, and concluded that:

> [a] petition procedure may not always be a completely precise or satisfactory
> barometer of actual community support for a political party, but the Constitution
> has never required the States to do the impossible. *Dunn v. Blumstein*, 405 U.S.
> 330, 360, 92 S.Ct. 995, 1012 (1972). Hard work and sacrifice by dedicated
> volunteers are the lifeblood of any political organization. Constitutional
> adjudication and common sense are not at war with each other, and we are thus
> unimpressed with arguments that burdens like those imposed by Texas are too
> onerous, especially where two of the original party plaintiffs themselves satisfied
> these requirements.

*Id*. at 786-87 (footnote omitted).

Finally, in *Storer v. Brown*, the Supreme Court found that, "standing alone" gathering

325,000 (or 5% of the total votes cast in California in the previous general election), in 24 days,

while still "a substantial requirement," would "not appear to be an impossible burden," relying

on the scheme upheld in *Jenness v. Fortson*. 415 U.S. at 740. The Supreme Court reasoned that

collecting signatures at the rate of 13,542 per day, by using 1,000 canvassers to gather 14

signatures per day, did not on its face require an "impractical undertaking for one who desires to

be a candidate for President." *Id*. Nonetheless, the Court found a remand was necessary to assess

critical facts concerning whether additional burdens, in combination with the signature and time-

limit requirements, imposed "excessively burdensome requirements upon independent candidates." *Id*. at 738. Specifically, the Court found that the record before it did not elucidate the true burden on independent candidates, since the California law disqualified from signing the independent's petition all registered voters who voted in the primary, and thus the actual number of qualified voters from which the requirement had to be satisfied within 24 days was left unclear to the Court. *Id*. at 739.

In light of *Jenness*, *White* and *Brown*, the challenged requirement that an independent candidate must collect 5,000 signatures out of the entire electorate within one year is not unduly burdensome on an independent candidate's associational rights, and falls easily within the constitutional standards for facial validity of nominating petition schemes. Since *Jenness* and *White*, federal courts have frequently upheld similar signature-gathering schemes against constitutional challenges. *See, e.g.*, *Nader v. Keith*, 385 F.3d 729, 735 (7th Cir. 2004) (upholding a 134-day time limit to gather 25,000 signatures, and listing other courts to have upheld similar schemes); *Nader v. Connor*, 332 F. Supp. 2d 982, 985 (W.D. Tex. 2004) *aff'd*, 388 F.3d 137 (5th Cir. 2004) (upholding Texas' requirement that an independent candidate for president obtain 64,076 petition signatures over sixty-two days to merit a place on the general-election ballot).

Further, contrary to what Duncan asserts, from a facial-challenge perspective, the scheme at hand does not require a remand for fact finding as to whether the challenged requirement is in practice unconstitutionally burdensome. Unlike in *Brown*, there is no factual dispute that Duncan can obtain, either independently, or with the assistance of a small number of volunteers, the requisite 5,000 signatures in one year, which amounts to about 14 signatures a day. Such a number is minimal, and, unlike in *Brown*, the entire registered electorate is open to him. Even assuming, as Plaintiff argues, that he only has seven months in which to gather the signatures due

14

to poor weather conditions during five months of the year, the scheme still falls well within the constitutional boundaries outlined above. As Defendants assert, the one-year requirement may place an individualized burden on Duncan's preferred method of signature-gathering, but such an argument constitutes an as-applied challenge, which this Court will address in the next section.

Finally, Duncan's argument that the one-year limitations period is an unreasonable burden on his right to access the ballot because he cannot afford to enlist the assistance of paid petition circulators is not well taken. As the Supreme Court emphasized in *Jenness*, *White*, and *Brown*, this Court is permitted to presume that independent candidates have the practical capacity to enlist a reasonable number of volunteers to assist in the signature-gathering process.

In sum, this Court concludes that the requirement that an independents candidate must collect 5,000 nominating signatures within one-year is reasonable and not unduly burdensome.

### b. Whether the One-Year Requirement is Discriminatory, in Violation of the Equal Protection Clause

In addition to his argument that the one-year time-limit on collecting nominating petition signatures impinges on his associational rights and those of voters, Duncan argues that the requirement is discriminatory in violation of the Equal Protection Clause because it places a severe and undue burden on him and similarly situated independent candidates that it does not place on either major or minor parties. Duncan contends that the major party candidates who are not mandated to circulate petitions are favored in that they do not have a one-year period in which to start their campaigns, but, instead, have a four-year timeframe to run for president.

Duncan's assessment misconstrues the ballot-access landscape, as independent and major party candidates under the Ohio ballot-access scheme do not have different restrictions on the amount of time that they have in which to campaign. Instead, as explained below, the necessary inquiry under the framework for assessing the constitutionality of regulations on ballot access is

15

whether an independent candidates' pathway to the ballot is so burdensome as to deny him or her effective access to the ballot, while the major-party candidate's different pathway is not so burdensome as to deny him or her access to the ballot.

The Supreme Court rejected in *Jenness v. Forston* the precise equal protection argument Duncan makes in the case *sub judice*, which is similarly premised on the foundation that it is "inherently more burdensome" for a candidate to gather the signatures of 5% or less of the electorate, within a timeframe of six months or more, than it is to win the votes of a majority in a major-party primary. 403 U.S. at 440. The Supreme Court explained in *Jenness* that, as a matter of law, Georgia had not violated the Equal Protection Clause by creating "two alternative paths" to the ballot—the party-primary process for major party nominees, and the signature-gathering process for independent nominees—"neither of which can be assumed to be inherently more burdensome than the other." *Id.* at 441. The Court reasoned that it could "hardly suppose that a small or a new political organization could seriously urge that its interests would be advanced if it were forced by the State to establish all of the elaborate statewide, county-by-county, organizational paraphernalia required of a 'political party' as a condition for conducting a primary election." *Id.*

Following *Jenness*, the Supreme Court in *Am. Party of Texas v. White* rejected a similar argument that the state had invidiously discriminated against smaller parties in violation of the Equal Protection Clause by requiring that their nominations be by convention, rather than by primary election, as was required of the major parties. 415 U.S. at 781. The Court explained that under equal protection jurisprudence, statutes may create classifications or procedures that are different for the different classes of candidates, but which do not deny equal protection; it is only "'invidious discrimination' which offends the Constitution." *Id.* at 780. In the context of

16

statutory differences in what is required of different types of candidates to gain access to the ballot, therefore, the only way a candidate can make a showing of "invidious treatment" is to demonstrate that what is demanded of one type of candidate is "so excessive or impractical as to be in reality a mere device to always, or almost always, exclude [political] parties with significant support from the ballot." *Id*. at 783.

Pursuant to *Jenness* and *White*, therefore, Plaintiff's equal protection claim fails, because that claim cannot stand merely on the ground that an independent candidate's path to the ballot is different than that of major party candidates. Instead, Plaintiff must make a showing of invidious treatment, which requires a demonstration that an independent candidate's path to the ballot is so impractical that he is effectively excluded from the ballot. This Court determined, *supra*, that the requirement that an independent candidate collect 5,000 signatures within one year is not an unreasonable burden on ballot access, and thus he cannot contend that he is effectively excluded from the ballot. Thus, Plaintiff cannot make a showing of "invidious discrimination" necessary to show an equal protection violation.

Plaintiff urges this Court to find that the facts of this case are similar to those in *Green Party of Tennessee v. Hargett*, where the Sixth Circuit held that a ballot retention statute placed an unequal burden on minor parties' access to the ballot. The statute at issue in that case required that recognized minor parties obtain 5% of the total number of votes cast for gubernatorial candidates in the last gubernatorial election to retain ballot access, while established major parties, "which have more institutional knowledge and financial resources," were given four years to obtain the same level of electoral success. 791 F.3d at 694. The Sixth Circuit concluded that pursuant to the rationale in *Jenness*, the differences between the parties did not justify the more burdensome pathway to the ballot for minor party candidates, but instead should have

17

warranted "having less onerous burdens on recognized minor parties than statewide political

parties." *Id*. Thus, unlike in *Jenness*, where the plaintiffs' claims failed because they did not

establish that the state imposed heavier burdens on independent candidates, in *Hargett* the

plaintiffs prevailed because the ballot-retention statute "clearly impose[d] a heavier burden on

minor parties than major parties by giving minor parties less time to obtain the same level or

electoral success as established parties." *Id*. at 694. As evidence of the intentionally "restrictive

nature" of the law, the Sixth Circuit also noted the fact that Tennessee amended its ballot-

retention statute immediately after the district court ordered it to include the plaintiffs'

candidates on the 2012 general election ballot. *Id*. (citing *Rhodes,* 393 U.S. at 30, 89 S.Ct. 5

(concluding that courts "must consider the facts and circumstances behind the law")). Thus, the

court concluded that the mere difference between the different types of parties, standing alone,

did not justify the different levels of burden placed upon them, and, if anything, justified a less

severe burden on the minor parties.

Defendant asserts, and this Court agrees, that this case is distinguishable from *Hargett*.

First, in *Hargett*, the challenged ballot-access regulation paved a nearly identical path to the

ballot for both major and minor parties, except that the hurdles along that identical path were

more burdensome for minor than for major parties, with no rational justification. In contrast, as

held in *Jenness*, the difference between independent candidates and major-party candidates

justifies the different paths to the ballot at issue in this case, as it would not make sense to require

an independent to run in a primary against any other candidate. Further, pursuant to *Jenness*,

although the paths to the ballot of independent and major party candidates are different, it cannot

be said that it is more burdensome to collect 5,000 signatures in one year than to run in and win a

major party primary. Thus, *Hargett* is in harmony with *Jenness*, which supports this Court's ruling.

Finally, Plaintiff contends that the requirement that he collect 5,000 signatures within one year invidiously discriminates against him on the basis of wealth, relying on *Lubin v. Panish*, 415 U.S. 709, 715-16, 94 S. Ct. 1315, 1319-20, 39 L. Ed. 2d 702 (1974). Plaintiff asserts that under the new scheme, he will be forced to spend extra dollars on his campaign, which may prevent him from getting on the ballot due to his lower economic status.

Plaintiff's reliance on *Lubin* is misplaced. In *Lubin*, the Supreme Court struck down a statute demanding a filing fee for nomination papers for the position of county supervisor, and providing no other reasonable, alternative means of ballot access for indigent candidates. The Supreme Court found that the filing fees requirement, standing alone, was not rationally related to the legitimate state interests of testing the genuineness of a candidacy and the extent of voter support for the candidate. *Id*. at 717, 94 S. Ct. 1315. The Court went on to note, however, that certain "obvious and well-known means of testing the seriousness of a candidacy" existed, which did not depend on the neutral ability to pay a filing fee, including: "impos[ing] on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election," and requiring a candidate who cannot pay the fee to "persuad[e] a substantial number of voters to sign a petition in his behalf." *Id*. at 719 (citations omitted). Thus, according to *Lubin*, and fatal to Duncan's argument, requiring a candidate to obtain a "substantial number" of voters to sign a nominating petition not only is not a hurdle to ballot access that invidiously discriminates against lower income candidates, but is, in fact a path which the Supreme Court has found avoids such discrimination.

19

In sum, the facial requirement that an independent candidate must collect 5,000 nominating-signatures within one year is neither unreasonably burdensome nor discriminatory. Thus, Ohio "'in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life,'" and "affords minority political parties a real and essentially equal opportunity for ballot qualification. Neither the First and Fourteenth Amendments nor the Equal Protection Clause of the Fourteenth Amendment requires any more." *Am. Party of Texas v. White*, 415 U.S. at 788, 94 S. Ct. 1296.

### 2.  Whether the Burden is Justified

Concluding that the challenged signature and date requirements are reasonable, nondiscriminatory restrictions on the rights of independent candidates and voters, the statute at issue is subject to rational basis review and will survive if the state can identify "important regulatory interests to justify it." *Hargett*, 791 F.3d at 693 (citing *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059). Under rationale basis review in the context of a ballot access case, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (citing *Anderson*, 460 U.S. at 788, 103 S. Ct. 1564). Damschroder testifies that the State's interests of detecting and preventing fraud, ensuring that an independent candidate has sufficient current support, and reducing the number of invalid signatures provide sufficient justification for the new one-year time-limit.

Generally speaking, as stated *supra*, the Supreme Court has held that the requirement that an independent candidate collect a reasonable number of nominating petition signatures within a reasonable period of time in order to gain access to the ballot is justified by a state's legitimate interests in ensuring that independent political candidates can show a "significant modicum of

support" from the public, and in avoiding "confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. Further, the Supreme Court has recognized that "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Timmons*, 520 U.S. at 364, 117 S. Ct. 1364.

Since the Ohio scheme is much less burdensome than the signature-gathering schemes upheld in *Jenness* and *White*, it appears at first blush that this Court need not go any further in assessing the State's justification for it. This assessment would be incorrect, however, because the precise question before this Court  is whether the change from giving independent candidates unlimited time to collect signatures, to giving them one year, is justified by an important regulatory interest in the Ohio scheme at issue in this case. Importantly, Duncan does not question the requirement that he collect nominating signatures. His contention at this stage of the inquiry is that the new requirement that " '[a] signature on a nominating petition is not valid if it is dated more than one year before the date the nominating petition was filed,"  O.R.C. § 3513.263, has no rational justification. The Court will consider each of the State's three justifications.

First, the important state interest in preventing election fraud is served by requiring validation of the petition signatures in general, but is not served further by the new one-year limit. After all, regardless of the time limit in which to obtain the signatures, boards of election must individually verify and certify each signature on a nominating petition.

Second, Damschroder testifies that the one-year time limit makes it more likely that legitimate signatures may be accurately and quickly verified, evidenced by the fact that for Plaintiff's 2008 petition, 6,370 of 12,716 signatures were invalidated, and for his 2012 petition,

4,561 of 12,480 signatures were invalidated. Damschroder explains that when the voter information is current, the board can easily match it with the address on file. Although this Court accepts as true that the one-year time limit will reduce the number of invalidated signatures, the State does not articulate clearly a purpose in reducing the number of invalid signatures. Damschroder explains that to verify a signature, the board must take each name, address, and signature and match it with the voter's registration file. If the individual is not registered, registered in another county, or has a non-matching address or signature, the signature is not validated. Under this description of the board's task, however, the new one-year time limit does not advance any interest in administrative efficiency, or serve any other purpose, as the boards of election must go through an identical process of individually verifying each signature, regardless of whether they are more likely to be found invalid if they are older than one year. Basically, the State fails to explain how the burden is greater to validate, rather than invalidate a signature, which is fatal to the Secretary's argument.

The only state regulatory interest in the one-year time limit which passes muster is ensuring that an independent candidate has sufficient current support before he or she gains access to the ballot. As Duncan argues, however, §§ 262 and 263 do not require that the signatures on the nominating petitions be dated within a year of the final deadline for turning in the petitions, but only that the signatures be dated within a year of filing the petitions. Ostensibly, then, an independent candidate is permitted to file his or her petition any time, even three years before the primary, so long as the petition contains 5,000 valid nominating petition that were obtained within a year of the date of filing. Damschroder testifies, however, that based on his experience, most candidates do not start their signature collection efforts until well within the one-year time-limit. Thus, the only potential saving grace for the Secretary is his argument

that although an independent candidate may file a valid petition well in advance of the filing deadline, in reality, this does not happen. So, the one-year time limit still advances, to some degree, the state's legitimate interest in requiring independent candidates to demonstrate a modicum of *current* support prior to the State placing them on the ballot. Damschroder provides no more evidence than his testimony. Nonetheless, the Defendant is correct that "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2643, 125 L. Ed. 2d 257 (1993). Furthermore, a state "has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'" *Id*. (citations omitted).

In conclusion, on its face, the requirement that an independent candidate must collect 5,000 signatures in one-year is constitutional, and is not a severe burden on an independent's candidates' associational rights because it is both minimally burdensome and non-discriminatory. Accordingly, under rational-basis review, the one-year restriction passes muster because it promotes the important regulatory interest of requiring an independent candidate to demonstrate a modicum of support close-in-time to the election.

### D.  As-Applied Challenge

The Court now will address Duncan's as-applied challenge to the one-year limitations period in which to gather his nominating petition signatures under §§ 262 and 263. Duncan asserts that the one-year limit is a severe burden on him personally because it "obliterates Duncan's beliefs or ideas or message of operating a low cost campaign, as he now must hire signature gatherers." Further, Duncan asserts that the shorter time period will force him to incur

23

extra travel costs. Duncan has taken pride in his low cost campaign, and believes many of his votes came from voters who supported his position that when money is involved in the elections process, "quid pro quo" takes place.

As detailed, *supra*, Duncan's argument that the new one-year limitations period will destroy his campaign message of low-cost campaigning is not well taken.  The Supreme Court made clear in *Jenness*, *White*, and *Brown* that Courts are to presume that independent candidates have the practical capacity to enlist some reasonable number of volunteers to assist in the signature-gathering process. Duncan has not shown any personal barrier to his ability to enlist the assistance of local volunteers, and thus keep his campaign costs at the same level they were prior to the new regulations.

Duncan next argues that, even assuming he can find volunteers for free to help him gather signatures, such an action would "alter or destroy Duncan's 'walking tour' and thus constitute a severe burden." (Doc. 84 at 1). Under Supreme Court jurisprudence in *Burdick v. Takushi*, however, even if Duncan had to utilize volunteers to collect all requisite signatures in one year, and thus alter the format and message of his campaign, his as-applied challenge to §§ 262 and 263 fails as a matter of law.

In *Burdick*, the Plaintiff challenged Hawaii's prohibition on write-in voting, claiming that it violated the First and Fourteenth Amendments. The Plaintiff argued that the absence of a write-in voting option discriminated against him based on the "content of the message he [sought] to convey through his vote . . . At bottom, he claim[ed] he [was] entitled to cast a 'protest vote' for Donald Duck," should he want to. 504 U.S. 428, 438, 112 S. Ct. 2059. The Supreme Court disagreed, holding:

> the function of the election process is "to winnow out and finally reject all but the chosen candidates," *Storer,* 415 U.S., at 735, 94 S.Ct., at 1281, not to provide a

means of giving vent to "short-range political goals, pique, or personal quarrel[s]." *Ibid.* Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently. *Id.,* at 730, 94 S.Ct., at 1279.

Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls. See *Munro,* 479 U.S., at 199, 107 S.Ct., at 539–540. Petitioner offers no persuasive reason to depart from these precedents. Reasonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth. And there is nothing content based about a flat ban on all forms of write-in ballots.

*Id.* Thus, under *Burdick,* Duncan's First and Fourteenth Amendment right to free association through gaining access to the ballot does not include the "more generalized expressive function" which he seeks to pursue through his preferred, individual style of signature-gathering. Instead, his rights are restricted to a consideration of whether he has meaningful access to the ballot. This Court has explained exhaustively that §§ 262 and 263 do not more than minimally burden Duncan's access to the ballot. Thus, his as-applied challenge fails as a matter of law.

## IV.    CONCLUSION

Plaintiff has failed, as a matter of law, to succeed on either a facial or as-applied challenge to the one-year limitations period on gathering nominating petition signatures for independent candidates, recently codified under §§ 262 and 263. Accordingly, Plaintiff's Motion for Summary Judgment is hereby **DENIED**, and Defendant's Motion for Summary Judgment is hereby **GRANTED**. This case is **DISMISSED**.

IT IS SO ORDERED.

_____s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

DATED:  August 26, 2015